FRIDOLIN PABST, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 2227.   Promulgated April 14, 1927.

1. In determining whether a net loss, as defined in section 204 of the Revenue Act of 1918 has been sustained, losses of a personal nature and not sustained in the trade or business regularly carried on by the taxpayer may not be considered.

2. A loss of an investment in stock, sustained by an individual in a certain year, may not be considered in ascertaining whether he sustained a net loss in that year where the stock became worthless prior to that year and the individual was not regularly engaged in the trade or business carried on by the corporation.

3. Neither may a loss of an investment in a mine be considered for such purpose, where neither the nature of the loss nor the fact that it resulted from operation of the mine in the year for which the net loss was claimed was established.

4. Evidence that, upon investigation during the tax year, the taxpayer was unable to locate or communicate with his debtor and ascertained that patents of the debtor, from the proceeds of the sale of which it had been agreed the debt should be paid, were unsalable, *held* to establish that debt had been ascertained to be worthless.

*Camden R. McAtee, Esq.*, and *H. A. Fellows, Esq.*, for the petitioner.

*C. H. Curl, Esq.*, for the respondent.

This is a proceeding for the redetermination of a deficiency in income tax for the year 1920 in the amount of $10,899.49. The deficiency letter shows overassessments for the years 1918 and 1919 and deficiencies for the years 1920, 1921, and 1922. The petitioner alleges that the Commissioner committed error (1) in refusing to allow as a deduction for 1918 a loss of $18,740 representing the amount (cost of stock) invested by the petitioner in the stock of the Amador Copper and Gold Mining and Milling Co.; (2) in refusing to allow

as deductions from gross income of 1919, $10,600 representing the cost to petitioner of shares of capital stock of the Al. A. Boeck Co., and $3,795.65 as a bad debt loss representing advances or loans made in prior years to G. Liebmann; (3) in refusing to allow a bad debt loss from the gross income of 1920 of $1,399.51, representing loans made to H. Cordes in years prior to 1913; and (4) in refusing to allow an alleged net loss sustained by the petitioner for the year 1919, or any part thereof, as an offset against the net incomes of 1918 and 1920.

### FINDINGS OF FACT.

1. The petitioner is an individual residing in Chicago, Ill., who was engaged in 1918, 1919, and 1920 in the business of manufacturing pharmaceutical preparations for sale and in the mining business as an operating owner of mines of various kinds and as an investor in mining enterprises.

2. The petitioner filed an income-tax return for 1919 in which he reported his net income from "business or profession" $78,246.60. He reported other income of $71.43 and a total net income from these sources of $78,318.03. He claimed as deductions therefrom:

| | |
|---|---:|
| Interest paid | $7, 190. 46 |
| Taxes paid | 496. 84 |
| Contributions | 1, 090. 10 |
| Bad debts and other deductions | 42, 836. 47 |
| Total | 51, 613. 87 |

The amount of $42,836.47 bad debts and other deductions is itemized in a statement attached to the return as follows:

| | |
|---|---:|
| Investment in Screen and Woodwork Factory of Raimund Pabst— Firm failed | $22, 606. 60 |
| E. Schlieff—Investment in Worthless Mining Stock | 2, 358. 96 |
| Dr. Swatek—Advance for Drilling Oil Well Proved Failure | 2, 500. 00 |
| Cyrus Barker—Advance for Mining Pyrites Proved Failure | 1, 603. 00 |
| A. Weiss—Advance for Manufacture of Rattol Rat Poison, Business Closed | 2, 991. 63 |
| G. Liebmann—Advance without Security Uncollectible | 3, 795. 63 |
| T. Harbeck—Loan without Security, uncollectible | 4, 000. 00 |
| G. Gregg—Loan, Party has disappeared | 800. 00 |
| One-half of up-keep of two automobiles used in connection with business | 973. 65 |
| Salaries paid stenographer and bookkeeper handling private affairs | 1, 207. 00 |
| | 42, 836. 47 |

The return showed a net taxable income subject to tax of $26,704.16 upon which a tax of $3,130.83 was assessed. The net taxable income was increased by the Commissioner's letter of January 28, 1924 (not in evidence), to $49,776.65 and reduced by the deficiency

letter to a net loss of $26,367.72 by allowing as a deduction the following:

| | |
|---|---:|
| Al. A. Boeck Co. loss | $13,802.38 |
| Loss on W. S. Plant | 1,500.00 |
| One-half auto expense | 973.65 |
| Malaspena Mine loss | 59,868.34 |
| Total | 76,144.37 |

3. In 1908 the petitioner bought the Malaspena Mine in British Columbia and operated it for a number of years. A loss in connection with this mine was allowed by the Commissioner as a deduction from gross income in computing net income for 1919. About the same time he also acquired the Redondo Mine in the same vicinity and subsequently abandoned its operation as a mine but still owns the property. In 1911 to 1914 he owned and operated a mine at Pierce, Idaho, in which he originally held stock and which property he took over to protect his interest and now holds this property on account of timber on it. In 1917 and 1918 he operated an iron pyrites mine in Colorado, and in 1918, 1919, and 1920 he shipped ore from the Redondo Mine. During these years he had several mining engineers in his employ and in charge of the mining operations, paying them substantial salaries for their services, which were allowed as deductions in computing taxable net income. Numerous expenditures by the petitioner in connection with mining operations were claimed in the return and allowed without question by the Commissioner. The deficiency letter shows that a stock loss in the Daisy Mine was allowed for 1918, and an operating loss in the Chicago-Idaho Mine was allowed in 1921. Petitioner visited his properties from time to time as was necessary, making two trips a year to some of them.

4. About 1905 or 1906, petitioner invested $18,740 in the stock of the Amador Copper and Gold Mining and Milling Co., which was also a holding company for other corporations. This company owned the entire capital stock of a 9-mile broad-gauge railroad leading to the Amador Mine, located about 12 miles from Missoula, Mont., and also 98 per cent of the stock of the company operating such mine. It also owned in its own right placer claims in the vicinity of the mine, 1,000 acres of land and other tangible assets.

In 1905 the company had cash on hand and accounts receivable totaling $221,626.86. The balance on hand in 1906 was $16,546.58. In 1908 the cash balance had been exhausted and the company was unable to sell any more stock. In 1908 a stockholders' committee was organized and took over the business. Apparently one or more of the subsidiary companies was in the hands of the receivers for a short while at about this time. Between the years 1908 and 1913

the holding company was never out of debt. From 1907 to 1918 the Amador Mine was in actual operation about half of the time. In 1915 a dividend was paid by the company and in 1917 a concentration plant costing $30,000 was installed. In 1918 it was definitely known that the company could not produce ore at a commercial profit. The advances of funds up to this time, or a considerable portion of them, were secured by receiver's certificates and liens upon assets of the several companies. In 1918 steel rails were selling at $75 to $90 per ton and the holders of receiver's certificates issued by the receiver for the railroad company instituted proceedings of foreclosure, sold the railroad, and same was dismantled in that year, leaving the mine without any transportation and causing a necessary abandonment of the enterprise.

5. About 1907 the petitioner became interested with one Boeck, and with petitioner's brother, a German manufacturer, in putting on the American market a wooden porch shade manufactured and imported from Germany. About 1908 the business thus begun was incorporated and the petitioner invested therein $10,600 for which there was issued to him thirteen twenty-fifths of the capital stock of $25,000 in the name of the petitioner and Boeck. The balance of the stock was issued to the brother in Germany, which was paid for in merchandise. The introduction of the porch shade was the beginning of a new business and the bringing to the American market of a new article. When additional shipments of merchandise became necessary the German manufacturer insisted that his invoices must be paid or guaranteed and petitioner accordingly offered and did guarantee to his brother payment for such shipments. The business was able to pay its ordinary overhead expenses from the proceeds of sales but not entirely to reimburse the petitioner for his guarantee advancements, which advancements were not paid through the checks of the company but were treated by petitioner as his individual obligations. The petitioner withdrew from the business in 1914, $7,100 and took same as a credit upon his advancement account. The accrued deficit of the company at the end of 1912 was $8,800. For the fiscal year ended August 30, 1913, the company had a deficit which was increased by charging off in that year incidental items which were previously carried on its books and were considered at that time to have become losses. The deficit at the end of 1913 approximated $24,000. The imported porch shades were sold throughout the United States principally to the larger and better known department stores, from which larger orders were being received each succeeding year. After the commencement of the World War, in 1914, importations were delayed and became difficult. In 1915 the business was conducted by mail

upon the basis of the merchandise in the United States and practically all sales were made upon mail orders. At the end of 1915 the remaining merchandise and the books were transferred from New York to Chicago and the New York office given up. Small sales were thereafter made by the petitioner until the stock was exhausted. In 1915 the porch shade trademark was assigned to the corporation by Boeck. In 1919, when communication with Germany was resumed, the petitioner made inquiry for the purpose of reviving the business and ascertained that his brother was unable to manufacture the required goods; that his machinery was gone; the proper woods, dyes, and cotton could not be secured; and that the completed porch shades could not be manufactured for import from Germany. In 1919 the petitioner paid to his brother $13,802.38 in settlement of his existing guarantee and the respondent has allowed this amount as a deduction from gross income in the petitioner's tax return for 1919. The respondent has disallowed the deduction from gross income of $10,600, representing the petitioner's investment in the stock of the company.

6. In 1903 and thereafter until 1917, the petitioner advanced to his brother-in-law, one Liebmann, a resident of Germany, various amounts aggregating $3,795.63. Liebmann went into the German army and on his return found his business demoralized. Shortly thereafter his wife, the sister of the petitioner, died. Liebmann married again, and the petitioner, having made inquiry, determined the Liebmann debt to be uncollectible in 1919 and charged the same off in his original income-tax return. The same was disallowed by the respondent. Afterwards the petitioner made endeavors to collect his debt through his brother residing in Germany and Liebmann offered 5,000 paper marks, having a value of less than 5 cents, in settlement of the debt. No collection has since been made of the debt.

7. Beginning in 1909 and continuing until 1912, petitioner loaned to one Cordes $1,399.51, upon the promise that when certain patents owned by Cordes were sold the debt would be paid. These patents were placed with a patent agency in Newark, N. J., for sale and Cordes returned to Europe to protect his inventions there. When the war came on communication with him was lost and not being able to hear from him in any way nor to obtain anything from the sale of the patents the petitioner charged off the debt in 1920 in his original return as a worthless debt and it was disallowed by the respondent. Subsequently petitioner continued his investigations and in 1924 received a certificate from the Dresden police to the effect that Cordes had died in that city in 1917. The petitioner has subsequently realized nothing upon the account.

SMITH: The most important question for decision is whether the petitioner had a net loss for the year 1919 within the meaning of section 204 of the Revenue Act of 1918. The respondent has found that the deductions allowable from gross income are $26,704.16 in excess of the gross income; the petitioner alleges that this excess should be increased in the amount of $10,600, representing an investment in the stock of the Al. A. Boeck Co., and by $3,795.65, representing the Liebmann bad debt ascertained and charged off in 1919. The respondent does not admit that the excess of the allowable deductions over the gross income represents a net loss under section 204 of the taxing statute. That section provides in part as follows:

(a) That as used in this section the term "net loss" refers only to net losses resulting from either (1) the operation of any business regularly carried on by the taxpayer, or (2) the bona fide sale by the taxpayer of plant, buildings, machinery, equipment or other facilities, constructed, installed or acquired by the taxpayer on or after April 6, 1917, for the production of articles contributing to the prosecution of the present war; and when so resulting means the excess of the deductions allowed by law (excluding in the case of corporations amounts allowed as a deduction under paragraph (6) of subdivision (a) of section 234) over the sum of the gross income plus any interest received free from taxation both under this title and under Title III.

(b) If for any taxable year beginning after October 31, 1918, and ending prior to January 1, 1920, it appears upon the production of evidence satisfactory to the Commissioner that any taxpayer has sustained a net loss, the amount of such net loss shall under regulations prescribed by the Commissioner with the approval of the Secretary be deducted from the net income of the taxpayer for the preceding taxable year; and the taxes imposed by this title and by Title III for such preceding taxable year shall be redetermined accordingly. Any amount found to be due to the taxpayer upon the basis of such redetermination shall be credited or refunded to the taxpayer in accordance with the provisions of section 252. If such net loss is in excess of the net income for such preceding taxable year, the amount of such excess shall under regulations prescribed by the Commissioner with the approval of the Secretary be allowed as a deduction in computing the net income for the succeeding taxable year.

We think that the contention of the petitioner that the excess of the deductions from the gross income of 1919 is a net loss under section 204 is untenable in the light of the evidence. It is not every deduction from gross income that is to be taken into consideration in determining a net loss. The petitioner's tax return for 1919 shows the deduction of many items that clearly are not connected with any regular trade or business carried on by him.

The petitioner's tax return for 1919 shows net income "from business or profession," as $78,246.60. The respondent has permitted deductions therefrom of $104,685.75 to produce a loss of $26,367.72.

The petitioner contends that the deductions should be increased by $10,600 and $3,795.65 above indicated. The $10,600 represents the cost to the petitioner of shares of stock of the Al. A. Boeck Co. The evidence shows that this company was laboring under an enormous deficit prior to the war period and that it had no net income during the war period. Its merchandise was practically all sold. We are of the opinion that the stock was worthless long prior to 1919 and that the petitioner is not entitled to claim any deduction from gross income of 1919 in respect of the worthlessness of this stock. We are of the opinion, however, that the petitioner sustained a loss in respect of his loans to G. Liebmann and that this loss is properly allocated to the year 1919. It was in this year that the petitioner determined the worthlessness of the debt and claimed it as a deduction from gross income in his tax return. The petitioner therefore had legal deductions for the year 1919 of $30,163.37 in excess of gross income. In the computation of such excess the following deductions from gross income have been made:

| | |
|---|---:|
| Interest paid on personal indebtedness | $7,190.46 |
| Personal taxes paid | 496.84 |
| Contributions | 1,090.10 |
| Investment in worthless mining stock | 2,358.96 |
| G. Liebmann—Loan without security—uncollectible | 3,795.65 |
| T. Harbeck—Loan without security—uncollectible | 4,000.00 |
| G. Gregg—Loan, party has disappeared | 800.00 |
| Salaries paid stenographer and bookkeeper handling private affairs | 1,207.00 |
| Advance for drilling oil well (proved failure) | 2,500.00 |
| Advance for mining pyrites (proved failure) | 1,603.00 |
| Advance for manufacture of Rattol Rat Poison (business closed) | 2,991.63 |
| Loss on W. S. plant | 1,500.00 |
| Al. A. Boeck Co. loss | 13,802.38 |
| Malaspena Mine loss | 59,868.34 |
| Total | 104,204.36 |

It will be noted from the foregoing that many of the deductions taken by the petitioner in his return were personal in nature and were not connected with his regular business. We have held in *Appeal of J. J. Harrington*, 1 B. T. A. 11, that losses upon investments in shares of stock by an individual are not legal deductions from gross income in determining a net loss under section 204 of the Revenue Act of 1921. A like ruling must be made under the Revenue Act of 1918. The petitioner was engaged in the business of manufacturing pharmaceutical preparations for sale and in the mining business as an operating owner of mines of various kinds and as an investor in mining enterprises. The evidence is conclusive that a

large part of the deductions above enumerated were not sustained in the "operation of any business regularly carried on by the taxpayer." The business of the Al. A. Boeck Co. was not a business regularly carried on by the petitioner. We are not informed as to the nature of the Malaspena Mine loss. We do not know whether it resulted from the operation of the mine in 1919. It was not claimed as a loss on the original return. The evidence does not warrant any finding that the petitioner sustained a net loss in 1919 under section 204 of the Revenue Act of 1918.

In view of our decision upon this point it becomes unnecessary for us to consider whether the petitioner sustained any loss in 1918 upon his investment in the stock of the company operating the Amador Mine.

There remains to be considered whether the petitioner is entitled to deduct from gross income of the year 1920, $1,399.51 representing the loss of his loan to one Cordes many years prior thereto. There is evidence that in 1920 the petitioner endeavored to ascertain the probability of collecting anything upon this account. The patents owned by Cordes were found to be unsalable and Cordes could not be located. Acting upon such information the petitioner charged off the account as worthless and claimed the amount as a legal deduction from gross income in 1920. We think the amount was deductible from the gross income of that year.

> *Judgment will be entered on 15 days' notice, under Rule 50.*

PHILLIPS dissents on the ground that the evidence establishes a net loss for 1919 which is deductible in 1918.